UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| DONALD FESSENDEN, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:15CV370-PPS |
| | ) | |
| RELIANCE STANDARD LIFE INSURANCE | ) | |
| COMPANY and ORACLE USA, INC. | ) | |
| GROUP LONG TERM DISABILITY PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION and ORDER

Some cases turn almost entirely on what the applicable standard of review is. This case is one of them. This is an ERISA case that was transferred to me last year in a district-wide reassignment of cases. Judge Lee, who previously was assigned to the case, held that Reliance Standard Life Insurance Company's decision to deny Donald Fessenden long term disability benefits would be reviewed under the deferential arbitrary and capricious standard, as opposed to deciding the case from scratch — the so-called *de novo* standard. When that decision was made by Judge Lee, the die was essentially cast.

There is substantial evidence on both sides of the issue of whether Mr. Fessenden is disabled. Although, after thoroughly reviewing the record, I am inclined to believe that Donald Fessenden is in fact disabled by his medical conditions, oddly, that conclusion is not what dictates the outcome here. Instead, given Judge Lee's earlier ruling, I am limited to a highly deferential standard of review which means Reliance's

rejection of Fessenden's claim for benefits will not be overturned unless Fessenden demonstrates that Reliance's decision was "'downright unreasonable'." *Walton v. National Integrated Group Pension Plan*, 587 Fed.Appx. 328, 329 (7th Cir. 2014), quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321-22 (7th Cir. 2007); *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 360 (7th Cir. 2011), quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006). *See also Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1138 (7th Cir. 2017) (Manion, J., dissenting). As long as the "'plan administrator's decision has rational support in the record,'" I must uphold it. *Geiger v. Aetna Life Insurance Company*, 845 F.3d 357, 362 (7th Cir. 2017), quoting *Edwards*, 639 F.3d at 360. Because there is rational support in the record for the decision made by Reliance, I must reluctantly affirm it.

Let's start with some background information. Donald Fessenden worked for Oracle USA as a Software Engineer Manager until January 2, 2008, when he stopped working due to fatigue and severe chronic migraine headaches. Fessenden applied for and was granted short term disability benefits through an employee welfare benefits plan with Reliance Standard Life Insurance Company. Years later on March 4, 2014, Fessenden made a claim for long term disability benefits. Reliance denied the claim and affirmed that decision in its administrative appeals process. Judge Lee held that the latter decision by Reliance — the decision denying the appeal— was untimely under applicable ERISA regulations. *See* DE 21 at 8; 29 C.F.R. § 2560.503-1. The delay in

denying Fessesen's appeal is important because it can have an effect on the standard of review. I will return to this critical issue in a moment.

Fessenden filed this lawsuit challenging the denial of long term disability benefits, and both sides now seek summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing cross-motions for summary judgment, a court must apply this standard to both motions and view all facts and draw all reasonable inferences in the light most favorable to the party opposing each motion. *Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. #506*, 545 F.3d 555, 559 (7th Cir. 2008).

Oracle's disability plan is governed by the Employee Retirement Income Security Act of 1974, commonly called ERISA. With respect to an employee benefit plan governed by ERISA, a plaintiff may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B). A court considers the denial of benefits *de novo* unless the plan grants the plan administrator discretionary authority to construe policy terms. *Cheney*, 831 F.3d at 849, citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan grants such authority, the court reviews only for abuse of that discretion— the deferential arbitrary and capricious standard. *Fontaine v. Metropolitan Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015); *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 767 n.7 (7th Cir. 2010), citing

3

*Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009). Most plan administrators seem to have gotten the memo. Almost every ERISA case I have encountered grants discretionary authority to plan administrators.

Here, the parties engaged in a lengthy dispute before Judge Lee about whether the *de novo* standard or the more deferential arbitrary and capricious standard of review applies. [DE 21, 29.] After two rounds of briefing, Judge Lee concluded that the plan clearly contains a discretionary clause giving Reliance authority to construe the plan and determine eligibility for benefits. Thus, the case would be governed by the arbitrary and capricious standard of review. [DE 29]. Judge Lee further concluded that although Reliance missed a deadline in making its claim decision, that wasn't enough to mandate a *de novo* review. [*Id.*] Reliance was saved by the substantial compliance doctrine. [*Id.*]

The guy who said that "close is only good in horseshoes and hand grenades" must not have heard of ERISA and the substantial compliance doctrine. In the murky world of ERISA litigation, being close enough is often considered to be good enough. This is because the substantial compliance doctrine often excuses plan administrators who don't turn square corners in following ERISA regulations.

But the substantial compliance doctrine doesn't always save the day from administrative foul-ups. The Second Circuit recently held that an insurer can lose the benefit of the deferential standard of review when it fails to comply with regulatory requirements relating to time limits for making claim decisions. *Halo v. Yale Health Plan, Director of Benefits & Records Yale Univ.*, 819 F.3d 42 (2nd Cir. 2016). In other words, the

court held that the substantial compliance doctrine may be inapplicable where deadlines are concerned. *Id.* at 55-58. This position is consistent with Seventh Circuit cases in other areas of the law that hold that a deadline that is blown by even one day is blown nonetheless. *See e.g. United States v. Marcelo*, 212 F.3d 1005, 1010 (7th Cir. 2000) (a habeas corpus petition that is filed one day too late is untimely and must be dismissed). It is also consistent with Seventh Circuit cases that have looked askance at an expansive use of the substantial compliance doctrine where its application would conflict with a literal requirement of the ERISA statute. *Burns v. Orthotek*, 657 F.3d 571, 575 (7th Cir. 2011). *See also Schneider v. Sentry Long Term Disability Plan,* 422 F.3d 621, 627-28 (7th Cir. 2005); *but see Edwards v. Briggs and Stratton Retirement Plan*, 639 F.3d 355, 361-62 (7th Cir. 2011). So according to the Second Circuit, when an insurer blows a deadline in making a claims decision, it may end up forfeiting the more deferential standard, and lead to district courts reviewing the claims decision under the *de novo* standard unless it can show that the failure to follow the regulations was inadvertent and harmless. *Halo*, 819 F.3d at 58.

Judge Lee was unpersuaded by the Second Circuit opinion in light of earlier Seventh Circuit cases that seem to rely on the substantial compliance doctrine in similar circumstances. DE 29 at 9, *citing Halpin*, 962 F.2d at 690. In sum, Judge Lee held that Reliance's failure to adhere to the regulations could be overlooked because their compliance was good enough. In other words, because Reliance substantially complied with the regulations governing the timing of its claims decision — remember, they didn't actually comply — the arbitrary and capricious standard governs this case.

Whether use of the substantial compliance doctrine is appropriate in this case is not for me to decide. After the case was transferred to me, I have not been asked to reconsider Judge Lee's ruling on this critical question. As a result, I will review Fessenden's claim under the arbitrary and capricious standard. [DE 29 at 10.]

In order to qualify for long term disability benefits under the plan, Fessenden was required to demonstrate (among other things) that as a result of sickness or injury he was unable to perform the material duties of his regular occupation from January 2, 2008 and for 24 months thereafter. [DE 57-1 at 7, 8, 17.] There are two decisions from Reliance Standard — both in letter form — denying long term disability benefits to Fessenden. [DE 57-4 at 34-44; DE 57-4 at 49-57.] Both the initial denial and its affirmance after appeal acknowledge Fessenden's history of migraine headaches and fatigue. [*E.g.*, *id*. at 40, 53.] In each decision, Reliance expressed its conclusion that those conditions had not rendered Fessenden unable to "perform the material duties of [his] regular occupation," as required to demonstrate disability under the plan. [*Id.* at 34, 42, 54.]

Reviewing all the medical history from 2006 to the time of decision, Reliance concluded that Fessenden "retained the ability to perform the material duties of [his] regular occupation" as of January 2, 2008. [DE 57-4 at 36.] That meant Fessenden was not totally disabled as the term was defined in the plan. [*Id*. at 34.] As noted, the question is not whether I agree with that decision but whether the decision is arbitrary and capricious – meaning does it have rational support in the record. *Geiger*, 845 F.3d at 362.

Fessenden claims that he is disabled by chronic fatigue syndrome. Chronic fatigue syndrome is "a complicated disorder characterized by extreme fatigue that can't be explained by any underlying medical condition. The fatigue may worsen with physical or mental activity, but doesn't improve with rest." MAYO CLINIC, Diseases & Conditions, Chronic Fatigue Syndrome, https://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/symptoms-causes/syc-20360490. Chronic fatigue syndrome can render a person feeble. Symptoms of the aliment include fatigue, sore throat, unexplained joint and muscle pain, headaches and extreme exhaustion. *Id.*

January 2, 2008 is the date on which Fessenden claims his chronic fatigue syndrome became disabling. Fessenden's case is hindered by the lack of a formal diagnosis contemporaneous with that claimed onset date. This problem is exacerbated by the fact that Fessenden made his disability claim in 2014, some six years after he claims he became disabled. Although it appears that Fessenden had many of the symptoms of chronic fatigue syndrome going back over a decade, he was only recently formally diagnosed with the affliction. He claims that he was misdiagnosed for many years and in fact has been disabled by chronic fatigue syndrome since 2008.

As I said at the outset of this opinion, there is substantial evidence on both sides of the disability issue. In support of his disability claim, Fessenden submitted evidence from three of his attending physicians. Dr. Sara Bajuyo is Fessenden's primary care physician. She first treated him in February of 2010. [DE 57-14 at 46.] According to Dr. Bajuyo, Fessesen has chronic fatigue syndrome and has had symptoms of the illness

7

since 2008 when he first left work. [DE 57-4 at 90]. Dr. Bajuyo says that the medical records from "October 2007 to present" support that conclusion. [DE 57-14 at 47.] Dr. Suhayl Nasr is a psychiatrist who first saw Fessenden in January or February of 2010. [DE 57-9 at 122.] Dr. Nasr has also diagnosed Fessenden with chronic fatigue syndrome. [DE 57-9.] She points to his various symptoms such as headaches, swollen lymph nodes, sore throat, unstable sleep patterns, profound malaise and cognitive issues as proof of her diagnosis. [*Id.*] Dr. Nasr says records going back to October 2007 support her findings. [*Id.* at 1327.] Finally, Dr. Irma Rey, a specialist in internal medicine and immunology, likewise has opined that Fessenden is disabled by chronic fatigue syndrome. [DE 57-4 at 87-88; DE 57-13 at 30-31.] According to Dr. Rey, Fessesen has exhibited all of the signs of that disease — persistent fatigue, sore throat, tender lymph nodes, muscle pain, poor sleep and memory and concentration problems. [DE 57-13 at 30; DE 57-8 at 68-72.]

Reliance's letters denying Fessenden's claim focused a lot on the lack of evidence of a disability contemporaneous with the 2008 onset date:

- [T]he medical evidence "did not substantiate a physical or mental health condition at a level of severity precluding him from performing the full-time material duties of a *sedentary* occupation" [DE 57-4 at 49];

- "[M]edical documentation during the period in question was essential in determining Mr. Fessenden's level of impairment per his actual work stoppage date" [*Id.* at 51];

- "In reviewing the documentation submitted by Mr. Fessenden's treatment providers, while it is noted that he has a history of fatigue and migraine headaches, there is no indication of a significant impairment relative to

8

these ailments prior to or immediately after the January 2, 2008, work stoppage date" [*Id*. at 53];

- "Prior to your work stoppage, you have a history of many chronic medical problems for years during a period wherein you were able to continue working, and the information considered does not reveal a significant deterioration in your status, at the time that you have claimed an inability to continue working." [*Id*. at 41].

The plan's adverse decisions reflected its review of the medical record, and its consideration of evidence that supported the claim of disability as well as evidence that did not. For instance, the plan cited visits to physicians in 2006 and 2007 with reports of headaches and fatigue, prior to the claimed onset date of disability, but noted normal MRI, ECG, laboratory testing and examination results. [DE 57-4 at 37.] In June 2007, Dr. Ramadevi Gourineni concluded that Fessenden's "sleep difficulties were likely due to being a *night owl* and having poorly controlled migraines." [*Id*.] In September 2007, after several months of treatment with Dr. Gourineni, Fessenden reported he was "sleeping better, and...only having a headache about once every two weeks." [*Id*.]

The plan reviewed medical evidence suggesting that the migraines continued in 2008, but also reflected that in June 2008, Dr. Joseph Eapen "noted that [Fessenden's] headaches were stable and [he was] doing better" since changing medicines and was "able to sleep well." [*Id*. at 38.] Doctors' records reflect that during visits in December 2008, Fessenden was "somewhat tired at the time, other than that no other real problems were noted." [*Id*.] In April 2009, the plan noted, Dr. Eapen's treatment notes reflected that headaches continued but "were described as mostly in the winter season." [*Id*.] The

9

plan's review of treatment in 2009 showed a focus on Fessenden's reported fatigue, with diagnoses of sleep phase disorder and depression or other mood disorder, rather than chronic fatigue syndrome. [*Id.* at 39.]

So the evidence goes both ways. On the one hand, Fessenden's more recent doctors believe that the records show that he was disabled by chronic fatigue syndrome going back to when he left work at Oracle in 2008. But none of these doctors saw Fessenden contemporaneous with the alleged onset date. They are drawing that conclusion by looking back in time. On the other hand, most of Fessenden's medical providers at the time believed that there were other explanations for his condition.

To break the tie in this kind of situation, Reliance tells me that they use third-party contractors to identify "independent and appropriately credentialed" doctors to review records and render an opinion, and that they do not directly compensate these doctors. [DE 59 at 15.] Reliance requires that the reviewing doctors maintain active medical practices or academic affiliations so that their income is not entirely derived from insurance examinations. [DE 33 at 9.] Reliance professes not to track the outcome of these medical record evaluations and it does not choose the third-party contractor based on the outcomes. [*Id.*]

In this case, Reliance hired Dr. John Brusch and Dr. Michelle Park to do an independent review of Fessenden's medical records. Here's what Dr. Park found:

> A large part of [Fessenden's] sleep disorder appears to be behavioral. He does not follow a good sleep hygiene regimen as recommended by his providers....[T]he claimant's fatigue is likely due to poor sleep habits,

> possibly a sleep latency disorder, and behavioral issues. The Claimant adamantly denies the depression is a contributing factor to any of his symptoms, and he has gone to great length to find a physician that agrees with him…The claimant was followed for some time by a multi-disciplinary headache clinic but was skeptical of their treatment methods and therefore stopped going. He has not been reporting severe or frequent headaches recently.

[DE 57-4 at 40.] Because Fessenden had several conditions that can cause fatigue, including poor sleep and likely depression, Dr. Park found that Fessenden did not meet the diagnostic criteria for chronic fatigue syndrome. [*Id.*] Dr. Park expressed the conclusion that there was no evidence to support that either Fessenden's headaches or his fatigue were functionally impairing. [*Id.*]

On Fessenden's appeal of the initial plan decision, the plan again reviewed the medical evidence Fessenden had submitted. From the medical record leading up to Fessenden's claimed onset date of January 2, 2008, the plan noted physician observations in June, July and August 2007 indicating that Fessenden's headaches had "decreased in severity," were "mild," and "were okay." [DE 57-4 at 51.] The plan's appeal decision acknowledges a continuing record of headache and sleep issues in 2008, but cites indications that the headaches were sometimes noted to be stable. [*Id*. at 52.] The plan's decision concludes that review of Fessenden's medical treatment for fatigue and migraine headaches showed "no indication of a significant impairment relative to these ailments prior to or immediately after the January 2, 2008 work stoppage." [*Id*. at 53.]

A second independent medical review was obtained by the plan for purposes of Fessenden's appeal. Dr. John Brusch noted that although Fessenden had complaints of

fatigue, sore throat, headaches and swollen lymphadenopathy, the conditions did not occur simultaneously, and that physical and neurological examinations produced no findings suggesting any need for restrictions or limitations. [*Id*. at 54.] Dr. Brusch expressed some skepticism about Fessenden's "willing[ness] to explore all reasonable possibilities and treatment," noting that he "essentially has refused to have adequate psychiatric evaluation and treatment as well as evaluation for obstructive sleep apnea." [*Id*.] He also pointed out that Fessenden had not undergone a formal functional capacity evaluation, which might have supported his claims of being unable to perform his job due to his medical conditions. [*Id*.] On appeal, the plan concluded that "the medical documentation provided fail[ed] to reveal restrictions and limitations consistent with a period of 90 consecutive days of '*Total Disability*' following [the] January 2, 2008, work stoppage date," that Fessenden "was capable of performing the material duties of his regular occupation prior to the Elimination Period ending April 1, 2008," and so was not "Totally Disabled" as defined in the policy. [*Id*.]

As this summary indicates, Fessenden has substantial medical evidence to point to in support of his claim that he is afflicted with a debilitating case of chronic fatigue syndrome, but there is also medical evidence to the contrary. As I said at the outset of this opinion, I am inclined to believe that the greater weight of the evidence supports Fessenden's disability claim. But under the arbitrary and capricious standard, the claimant may lose even if a preponderance of the evidence supports a finding of disability, so long as the decision has "rational support in the record." *Davis v. Unum*

*Life Ins. Co. of America*, 444 F.3d 569, 576 (7th Cir. 2006), quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). Because there was medical evidence on both sides of the disability analysis, and two reasoned opinions explaining the denial of benefits, I must reluctantly affirm the plan's decision under the arbitrary and capricious standard. "[R]eaching a decision amid...conflicting medical evidence is a question of judgment that should be left to [the Plan administrator] under the arbitrary-and-capricious standard." *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 578 (7th Cir. 2006).

**ACCORDINGLY:**

Plaintiff Donald Fessenden's motion for summary judgment [DE 55] is DENIED.

Defendants Reliance Standard Life Insurance Company and Oracle USA, Inc. Group Long Term Disability Plan's motion for summary judgment [DE 58] is GRANTED.

The Clerk shall enter judgment in favor of defendants and against plaintiff, affirming the denial of long term disability benefits to plaintiff Fessenden under the defendant plan.

**SO ORDERED**.

ENTERED: January 17, 2018     /s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**